## Lowe v. Hart.

### Opinion delivered January 31, 1910.

1. Judgment—Refusal to Amend.—Where the court's recollection was that its judgment was correctly entered, its refusal to amend the judgment will not be interfered with if there is no evidence to show that any different judgment was in fact rendered. (Page 558.)

2. Instructions—Repetition.—The court's refusal to give a particular instruction is not error if the proposition of law contained therein is fully covered by other instructions given. (Page 559.)

3. Gifts—Requisites of Gift Inter Vivos.—To constitute a valid gift *inter vivos,* the donor must have been of sound mind, must have actually delivered the property to the donee, and must have intended to pass title immediately, and the donee must have accepted the gift. (Page 559.)

4. Instructions—Construction as a Whole.—If the various instructions given in a case separately present every phase of the law as a harmonious whole, there is no error in a particular instruction failing to carry qualifications which are explained in others. (Page 559.)

5. Pleading—Construction of Complaint.—Where a complaint alleged that plaintiff was entitled to a chose in action by virtue of a gift, it was admissible to prove that the gift was either *inter vivos* or *causa mortis.* (Page 560.)

6. Actions—Election.—Where a complaint alleged that plaintiff was the owner of a certificate of deposit by gift, it was not error to refuse to compel plaintiff to elect to claim that the gift was either *inter vivos* or *causa mortis.* (Page 560.)

7. Instructions—Weight of Evidence.—An instruction which directs the jury to consider "all the facts and circumstances surrounding the

transaction," and mentions particular facts which the evidence tends to prove, without isolating any facts so as to give them special emphasis, is not objectionable as being on the weight of the evidence. (Page 560.)

8. GIFTS—BURDEN OF PROOF.—The rule in civil cases that the jury must decide in favor of the party in whose favor the weight of the evidence proponderates applies in case of a gift *causa mortis,* though the evidence to establish such a gift must be clear and convincing. (Page 561.)

9. SAME—WHEN INTER VIVOS.—Where the holder of a certificate of deposit intended at the time he handed it to another to pass the title immediately, and the latter accepted it as her own, the gift was *inter vivos,* though the donor knew he was about to die. (Page 562.)

10. SAME—WHEN CAUSA MORTIS.—When one on his deathbed gave a chattel to another, intending to pass title in the event of his death, and the latter accepted the gift, there was a gift *causa mortis.* (Page 562.)

Appeal from Greene Circuit Court; *Frank Smith,* Judge; affirmed.

### STATEMENT BY THE COURT.

J. H. Carroll died March 2, 1908. His only known next of kin were seven children of a brother who had died in Leeds, England. Carroll deposited with the First National Bank of Paragould, Arkansas, a sum of money, and received the following certificate:

"The First National Bank of Paragould
"No. 1323.
"Certificate of deposit not subject to check.
"Paragould, Arkansas, Oct. 18, 1907.

"J. H. Carroll has deposited with this bank eighteen hundred ten and no-100 dollars ($1,810), payable to the order of himself in current funds on return of this certificate properly indorsed.

"Not over two thousand dollars—$2,000.00.

"With interest at the rate of 4 per cent. per annum if left 6 months; — per cent. per annum if left — months.

"J. M. Lowe, Cashier."

This suit was brought May 22, 1908, against the bank; appellee alleging that on or about the 19th of February, 1908, J. H. Carroll gave to appellee the certificate of deposit and the money represented by it, and that she is the lawful owner and holder thereof; that on the 2d day of March, 1908, J. H Carroll

died; that said certificate is past due and unpaid. She prays judgment for the amount and her costs.

The bank on August 21, 1908, filed petition for "bill of interpleà" under section 6013, Kirby's Digest, setting up the death of Carroll, intestate, that J. M. Lowe was the administrator of his estate, and praying for an order requiring said J. M. Lowe as administrator to appear within such time as the court may fix, and either maintain or relinquish all claims he may have as such administrator, and that such judgment be rendered as will protect it against the payment of said certificate of deposit or any part thereof to any other person or persons whomsoever," etc.

The citation was issued, and Lowe responded, setting up that he was the administrator of J. H. Carroll, deceased, and asking that he be substituted as party defendant in said cause of action; that the style of said cause of action be changed to 'Agnes Hart, plaintiff, *v.* J. M. Lowe, as administrator of the estate of J. H. Carroll, deceased, defendant,' and that as such he be permitted to plead, answer or demur to said plaintiff's complaint, and for all other proper and needful relief."

On September 2, 1908, Lowe, administrator, filed a motion to compel plaintiff to make her complaint more specific by stating whether she claimed the certificate as a gift *inter vivos* or *causa mortis.* This motion was overruled, and appellant duly excepted.

On September 2, 1908, Lowe, administrator, filed his answer, alleging therein his appointment, denying the gift, and setting up Carroll's mental incapacity to make a gift.

On the 8th day of February, 1909, the cause was submitted to a jury upon the evidence and under the instructions of the court. A verdict was rendered for plaintiff.

Two days after the trial, on February 10, 1909, Lowe, as administrator, filed his motion for the allowance of an order *nunc pro tunc,* showing that the style of the cause of action had been changed on motion of appellant before the hearing, substituting him as defendant and making the style of the case: "Agnes Hart, plaintiff *v.* J. M. Lowe, as administrator of the estate of J. H. Carroll, deceased, defendant."

The court heard evidence on the motion for *nunc pro tunc* order. The cashier of the First National Bank testified that he

made an entry in the certificate of deposit register of the bank opposite certificate 1323, which is the certificate involved here, as follows: "Transferred to court, 9-1-08; do not pay except by instruction of court. Lowe, Cashier." The clerk of the court was introduced and identified the record of the minutes of the judge's docket. These were as follows: "Third day: Response of administrator and petition to be made party defendant. Order granted, and administrator made party defendant, and exceptions."

The court overruled the motion for order *nunc pro tunc,* stating: "So far as the recollection of the court goes, the record reflects what was done. * * * I think the order of record upon the minute made on the second day practically takes care of both propositions," [*i. e.* for the bank to pay the money to the clerk, and for appellant to be made a party defendant.] The main idea at the time was, for a variety of reasons, to make the administrator a party, and over the objection of plaintiff this was done, and that is what is intended to be done by these orders." The appellant duly objected and excepted to the court's ruling. Counsel for appellee state the facts as they might have been found in her favor as follows:

J. H. Carroll came to this country many years ago from Ireland. He was a section foreman on the Paragould Southeastern Railway, and lived for some time with Mr. and Mrs. Hart. He had no other home, and had no relatives except a brother in England, whom he had not heard from in nine years. When Mr. and Mrs. Hart left the P. S. E. Railway and moved to Paragould, Mr. Carroll expressed great regret that they moved away and left him. He told Mr. Wright and Mr. Stout that he liked to live with Mr. and Mrs. Hart; that their house was his home; that Mrs. Hart had treated him so well when he was sick at her house, and had taken such good care of him, that she was like a mother to him, and the family were more like homefolks to him than anybody he had ever met.

About February 1, 1908, Mr. Carroll took sick, and his friend, Mr. Wright, engineer on the P. S. E. railroad, brought Mr. Carroll to Paragould on his train. At the station Mr. Wright told Mr. Carroll that he must go to the sanitarium, but Mr. Carroll said: "No, I want to go home." Wright asked him

where his home was, and Mr. Carroll replied: "John Hart's." Wright insisted that he go to the sanitarium, but Mr. Carroll as strongly insisted on going to Hart's. Upon Wright's repeated and urgent requests Mr. Carroll finally consented to go to the sanitarium. But he was not satisfied there. He sent for Mrs. Hart to come up and see him, and she did so.

At the sanitarium Mr. Carroll gave Mr. Wright some instructions about unloading his ties, and Mr. Wright told him not to bother himself about ties, and said to Mr. Carroll: "You have got plenty of money, haven't you?" and Mr. Carroll then showed Mr. Wright the certificate in controversy and two P. S. E. railroad checks for wages. Mr. Wright then told him that he needn't bother himself any more about ties, that he had enough money to last him as long as he would live, and then Mr. Wright asked him, "What are you going to do with this stuff anyhow? You may die." And Mr. Carroll said, "John Hart's folks will know what to do with my stuff." Mr. Carroll then told Wright to tell John Hart to come up there; that he wanted to go to John Hart's house; that he wanted to get away from the sanitarium; that he didn't like the place.

Mr. Carroll told Dr. Dickson, one of the proprietors of the sanitarium, that he wanted to go over to Mrs. Hart's home; that he had lived there before; he thought he wasn't going to get well in the sanitarium, and Dr. Dickson intimated to him that he could not get well, and he seemed to want to die at the home of his friend Hart. At Mr. Carroll's request he was taken to the home of Mrs. Hart.

Upon entering Mrs. Hart's home Mr. Carroll, after seating himself by the fire, took an envelope from his pocket, opened it, took out of it the certificate of deposit, read it carefully, and then, in the presence of Mrs. Gregory, handed it to Mrs. Hart, and said: "Here is a check for my money." Mrs. Hart took it and put it away. Dr. Dickson advised Mrs. Hart to get Mr. Carroll to make a will and to call in Father Feurst to advise him to do so, but Mr. Carroll would not talk business with the priest. Mr. Carroll's old friend, Mr. Stout, called to see him several times, and on one occasion he talked about making a will. Mr. Carroll said he had thought at first he would make a will, but afterward changed his mind; that

he had already given the certificate to Mrs. Hart; that if he willed what he had away he would die a pauper; Mr. Carroll asked Mrs. Hart to get the certificate and show it to Mr. Stout; and he asked Mr. Stout to look it over and see if it is "O. K.," and in the presence of Mr. Stout, Mrs. Gregory and Mrs. Hart, Mr. Carroll said he had given the certificate to Mrs. Hart, and handed it back to Mrs. Hart. He said then when he handed it to her that he had given it to her, and she would know what to do with it in a few days. Mrs. Hart kept the certificate as her own property from the time Mr. Carroll first gave it to her. Mr. Carroll was of sound mind, and knew what he was doing when he gave Mrs. Hart the certificate and when these various transactions occurred.

The jury might have found the facts as thus stated. The court instructed the jury as follows:

"1. Gentlemen of the jury: Mrs. Hart claims that Mr. Carroll gave her the certificate of deposit which was introduced in evidence. Mr. Carroll is dead, and his administrator now comes and denies that Mr. Carroll ever gave Mrs. Hart this certificate, and further denies that at the time of the alleged gift Mr. Carroll had sufficient capacity to make a valid gift."

"2. You are instructed that, in order for you to find that Mr. Carroll made a valid gift of the certificate in question, you must find, first, that Mr. Carroll was at the time of the alleged gift of sound mind, that is, that he knew and understood the effect of his act and intended that effect; second that he actually delivered the certificate in question to Mrs. Hart; third, that by such act he intended to pass title to said certificate in question to Mrs. Hart to take effect immediately; and, fourth, that Mrs. Hart actually accepted said certificate as a gift.

"3. In determining whether, at the time of the alleged delivery of the certificate to Mrs. Hart, Mr. Carroll intended to make a gift of it to her, you may take into consideration all the facts and circumstances surrounding the transaction, the acts and declarations of the deceased at the time and before and after the alleged gift, the relationship existing between Mr. Carroll and Mrs. Hart or her family, whether friendly or otherwise, and his mental condition.

"5. Neither sickness nor infirmity will disqualify one for

making a gift if sufficient mind remains; and if the jury believe from the evidence that Mr. Carroll delivered the certificate of deposit in controversy to Mrs. Hart with the intent of making it a gift to her, and that he made any declarations with reference thereto, the jury may consider these things, in connection with all the other evidence, in determining the mental capacity of Mr Carroll; and if they believe from all the evidence before them that he knew what he was doing at the time and intended by such delivery and declaration to make a gift of the certificate to Mrs. Hart, they will find a verdict sustaining the gift.

"9. The burden of the proof is upon the plaintiff to establish by a preponderance of the evidence a valid gift of the certificate in question by Mr. Carroll to her. So if, from a consideration of the entire case, you find the evidence equally balanced for and against the alleged gift, it will be your duty to find for the interpleader and against the plaintiff."

The appellant objected and duly excepted to the giving of the above prayers.

The court at the request of appellant gave instructions defining "gift" and enumerating the essential elements of a gift *inter vivos* and *causa mortis.*

In instruction number 5 given at appellant's instance the court said: "You are instructed that, ·before the plaintiff can recover in this case, she must show by a fair preponderance of the evidence a specific intent of Carroll to part with all right, title and interest in and all dominion and control over the certificate and to confer on plaintiff and vest her with the absolute right, title and interest in said certificate and the money which it represented, and delivery by him to her of the certificate for the purpose of safe-keeping or any other purpose, either express or implied, other than a specific intent to give her would not constitute in law a gift."

The court refused the following prayers:

"This is a suit brought by the plaintiff, Mrs. Agnes Hart, against the First National Bank of Paragould, Arkansas, to recover on a certificate of deposit issued by the bank to one J. H. Carroll for the sum of $1,810. She alleges that J. H. Carroll is dead, but that he gave her the certificate before he died. The bank

answered, disclaiming any and all interest in the money, and informed the court that J. M. Lowe, the administrator of the estate of J. H. Carroll, claimed the money as belonging to the heirs of J. H. Carroll, and the bank no longer has an interest in the lawsuit. The court then issued a citation to the said J. M. Lowe, as administrator of the estate of J. H. Carroll, deceased, and required him to file, within three days, his pleadings. The administrator, Mr. Lowe, answered and denied that J. H. Carroll ever gave the certificate to Mrs. Hart, and further denies that at the time of the alleged gift Mr. Carroll had sufficient mental capacity to make a valid gift. Mrs. Hart now offers to pay all debts of the estate, and so the parties interested in this lawsuit are Mrs. Hart, upon the one hand, and the children of Charles Carroll, represented by the administrator, upon the other hand. The court tells you that Mr. Lowe not only has the right, but it is his duty as administrator to protect whatever right, if any, the children have in the money." The above is designated "statement."

"1. You are instructed to return a verdict for the defendant.

"6. You are instructed that the First National Bank of Paragould, Arkansas, has no interest whatever in the results of this lawsuit; that it filed in this suit its disclaimer, tendering into court the full amount of money represented by said certificate, and was by order of this court discharged; and that the only parties interested in the result of this lawsuit are the plaintiff, Agnes Hart, on the one hand, and the heirs of Charles Carroll mentioned in the stipulation, who are here represented by J. M. Lowe, administrator of the estate of J. H. Carroll, deceased.

"8. A mere intention to give, however strongly held or expressed, is not sufficient in law to constitute a gift; and you are instructed that, even if you should find from the evidence that Carroll intended to give the certificate to plaintiff at some time before his death, still this would not be sufficient to entitle the plaintiff to recover, unless you further find from the evidence that said gift was actually made and concluded."

The court entered a judgment in accordance with the verdict in favor of the appellee for the sum of $1,846.20.

A motion for new trial, assigning as error the various rulings to which exceptions were saved, was filed and overruled. This appeal has been duly prosecuted.

*Huddleston & Taylor,* for appellant.

1. It is clearly shown by the evidence that the court had previously actually granted an order discharging the bank and changing the style of the cause by substituting Lowe, administrator, as defendant, and that this order had not been entered upon the record. The court's arbitrary refusal to grant the *nunc pro tunc* order and cause the record to speak the truth is not to be justified on the ground of discretion. The bank was an interpleader, every essential element of an interplea being contained in the only pleading filed by it until it' joined with Lowe in asking for the *nunc pro tunc* order. 23 Cyc. 3. The only order the court could have legally made was to discharge the bank, substitute Lowe, and order the cause to proceed to trial. 19 Ark. 148; *Id.* 297; 54 Miss. 642; 23 Cyc. 31; 29 Cent. Dig. § 5, tit. "Interpleader;" 18 Atl. (N. J.) 680.

2. It was error to refuse the statement of the case requested by the appellant. The jury could not take judicial knowledge of the pleadings, nor know their meaning unless explained to them. This statement should have been given either alone, or in connection with instruction No. 6. 1 Brickwood, Sackett on Instructions, § 367; 50 Cent. Dig., § 587, "Witnesses."

3. It was manifest error to refuse the eighth instruction requested by appellant. Certainly, he was entitled to a specific instruction on the point that a mere intention to give, however strongly expressed, is not sufficient, and such refusal is not cured by the giving of a general instruction. 90 Ark. 247; 69 Ark. 134; 82 Ark. 503; 76 Ark. 227; 80 Ark. 438; 80 Ark. 454.

4. The second instruction given is erroneous. If there was a gift, it was a gift *causa mortis,* a necessary element of which is that the donor must, at the time, be under the apprehension of death. This element of a gift *causa mortis* was entirely omitted from the second instruction, and it cannot be said that the error was cured by the giving of another instruction at appellant's request covering that point. It was im-

possible for the jury to know which instruction should guide them or to know which one they followed. 61 L. R. A. 337; 8 L. R. A. 494; 65 Ark. 64; 87 Ark. 364; 77 Ark. 201; 82 Ark. 111. The rule that all instructions given must be considered together cannot be invoked to cure the error in an instruction which is wrong and misleading. 74 Ark. 585; 75 Ark. 266; 76 Ark. 224; 79 Ark. 427. 1 Blashfield's Instructions to Juries, § 76, p. 168.

5. Instructions which single out certain facts on which a party relies, and which inform the jury that they may consider certain facts in determining questions of fact before them, are erroneous. The third and fifth instructions given were erroneous for these reasons. 1 Blashfield on Instructions, § 109, pp. 246-249; 4 So. 225; 5 So. 454; 73 S. W. 903; 30 Ark. 383; 37 Ark. 333; 75 Ark. 76; 37 Ark. 251.

6. The ninth instruction, to the effect that a preponderance of the evidence was sufficient to support a finding that there was a valid gift, was erroneous. Deathbed donations, to be upheld, ought to be above question or suspicion at all times. 15 Moo. P. C. 215; 43 Atl. (Md.) 45; 26 N. E. (N. Y.) 744; 21 N. E. (N. Y.) 141; 30 Atl. (R. I.) 626; 1 Wills. C. H. 445; 54 Pa. 267; 52 N. E. 465; 65 S. W. 592; 27 Atl. 127; 5 Gill, 506; 16 Gray 402; 47 Atl. 34; 36 N. C. 130; 3 N. E. 532; 37 Atl. 936; 24 S. E. 280; 28 W. Va. 412; 5 S. E. 721.

7. The plaintiff should have been required to elect which kind of gift, *causa mortis* or *inter vivos,* she would go to trial upon. 25 L. R. A. 656; 69 L. R. A. 601.

8. To constitute a valid gift *causa mortis,* the delivery of the gift must be accompanied by some act or declaration by the donor indicating that such gift was intended. 85 Pac. 1056, 15 Wyo. 34; Thornton on Gifts and Advancements, § 73; 139 Mass. 379; 16 S. W. 201; 60 N. Y. Supp. 523; 26 N. E. 744; 111 N. W. 761; 56 N. W. 770; 65 Atl. 129.

*Johnson & Burr,* for appellee.

1. The court did not err in refusing to enter the *nunc pro tunc* order. A *nunc pro tunc* order does not create, but states what has been done. 72 Ark. 21; 51 Ark. 224; 55 Ark. 30. Allowance of amendments to the record by *nunc pro tunc* orders, long after the term, addresses itself to the sound discretion of the court. 17 Enc. Pl. & Pr. 921, 926.

2. There is no error in the court's charge. The court properly refused the *statement of the case* as requested. A mere intention to give is not a gift of any kind. In all the court's instructions every element of a gift *inter vivos* and *causa mortis* is clearly and specifically set out. 119 S. W. 261. An instruction which might be misleading by reason of incompleteness, when standing alone, may be cured by other instructions which supply the omission. 67 Ark. 416; 60 S. E. 630. None of the instructions unduly single out or emphasize any particular fact in evidence. 13 S. W. 1098; 49 Ark. 367.

3. The *quantum* of evidence necessary to establish a gift is a preponderance only, and not "beyond a reasonable doubt," as in criminal cases. 20 Ark. 592-8; 1 Straskie, Ev. p. 543; 1 Greenl. Ev. 13a; 11 Am. & Eng. Enc. (2 ed.) 491; 11 Current Law, p. 416; 14 Am. & Eng. Enc. L. (2 ed.) p. 1067.

4. It was not necessary for plaintiff to elect; the complaint stated a good cause of action. 5 Enc. Pl. & Pr. pp. 334-337; 5 Am. & Eng. Enc. L (2 ed.) 776. It was wholly immaterial whether the gift was *inter vivos* or *causa mortis*. 44 Ark. 42; 43 Ark. 307; 59 Ark. 191; 60 Ark. 169; 72 Ark. 307.

5. Where a verdict is based on conflicting evidence, it will not be set aside on appeal, unless there is *no legal* evidence to support. 116 S. W. 660; 67 Ark. 399; 73 Ark. 377; 75 Ark. 111; 76 Ark. 115; 121 S. W. 920. The sufficiency of the evidence was not properly challenged in this case. 121 S. W. 1046-50; 118 *Id.* 253; 79 Ark. 401-7.

6. It was proper to give the certificate to Mrs. Hart without indorsement, and the failure to indorse it does not create any presumption against the gift. 3 Pom. Eq. Jur. (3 ed.), § 1148; 103 S. W. 147; 104 S. W. 1031; 81 Ky. 425.

7. Where a verdict seems to be against the preponderance of the evidence, still, if it is supported by legal evidence, it is conclusive on appeal. 116 S. W. 660; 121 *Id.* 920.

WOOD, J., (after stating the facts). 1. As a *"nunc pro tunc order"* is intended to state what the court did, and not what it should have done, we must take the finding of the court as correct, that what was done and intended to be done by the orders "was to make the administrator a party." *Tucker* v.

*Hawkins,* 72 Ark. 21; *Gregory* v. *Bartlett,* 55 Ark. 30; *Cox* v. *Gress,* 51 Ark. 224.

The court's recollection and construction of its own order must be accepted, in the absence of any oral evidence or anything in the record itself to the contrary. The minutes on the judge's docket do not show that any different order was made than that found by the court to have been made at the time of the entry on the minutes of what was done on the judge's docket. These minutes do not warrant us in reaching a conclusion contrary to the finding of the court. It was within the sound discretion of the court under the evidence adduced to refuse to make the order *nunc pro tunc,* as requested by appellant. See 17 Enc. Pleading & Practice, 921, 926; *Stockdale* v. *Johnson,* 14 Ia. 178.

But, even if the rulings of the court were erroneous, the error is not prejudicial. The bank was a mere depository of the fund, and held the same in trust for the owner, as the jury must have known. The interest that a cashier and clerk would have in a matter of that kind would be so slight that no sensible juror would distrust their evidence on that account or give it less weight.

2. It follows that there was no error in the rulings of the court in refusing appellant's prayer designated "statement" and his prayer number 6, nor in the giving of appellee's prayer number 1.

3. There was no error in refusing appellant's prayer number 8. The court in several instructions at appellant's request fully covered the proposition of law contained in this prayer, and the jury were specifically instructed on this point. See *Maxey* v. *State,* 66 Ark. 523.

4. Prayer number 2, given at the request of appellee, was a correct declaration of law as to the essential elements of a gift *inter vivos.* The appellee claimed the money on deposit as a "gift," and under the allegations of her complaint she could prove that it was either a gift *inter vivos* or *causa mortis.* In another instruction the court correctly told the jury what was necessary to constitute a gift *causa mortis.* These instructions, taken together, accurately declared the law as to the essential elements of a gift either *inter vivos* or *causa mortis,* and

gave the jury a correct guide to determine from the evidence whether there was a gift of either kind. It often occurs that the law applicable to every phase of a case can not be presented in a single instruction.

"If the various instructions given in a case separately present every phase of the law as a harmonious whole, there is no error in a particular instruction failing to carry qualifications which are explained in others." *St. Louis S. W. Ry. Co.* v. *Graham*, 83 Ark. 61; *Southern Anthracite Coal Co.* v. *Bowen*, *ante* p. 140, and cases there cited.

The separate and independent propositions of law defining the two kinds of gifts were not erroneous, and were not in conflict. The two together declared the law applicable to the facts in evidence. *Thomas* v. *State*, 74 Ark. 431; *Lackey* v. *State*, 67 Ark. 416.

5. It follows also that the court did not err in refusing to compel appellee to elect as to the character of the gift. The sole issue was whether or not there was a gift. If appellee established the fact of a gift, either *inter vivos* or *causa mortis*, her cause of action was complete, because in either case, if proved, she was the owner of the money and entitled to recover. See *Newton* v. *Snyder*, 44 Ark. 42; *Nolen* v. *Harden*, 43 Ark. 307; *Ammon* v. *Martin*, 59 Ark. 191; *Hatcher* v. *Buford*, 60 Ark. 169; *Ragan* v. *Hill*, 72 Ark. 307. There was but one cause of action stated in the complaint.

6. Instructions three and five given at appellee's request are not instructions on the weight of the evidence. They are not so framed as to give undue prominence to any particular fact. The jury are told that they may consider "all the facts and circumstances surrounding the transaction;" and while mention is made of particular facts which the evidence tends to prove, no one of these is isolated and stressed so as to give it special emphasis or importance over any other fact proper for the jury to consider. Similar instructions have been approved in former opinions of this court. *Campbell* v. *Carnahan*, 13 S. W. 1098. It is the duty of the court "to give specific instructions correctly and clearly applying the law to the facts of the case." *St. Louis & S. F. Rd. Co.* v. *Crabtree*, 69 Ark. 134; *Taylor* v. *McClintock*, 87 Ark. 243, 280-281, and cases cited. Such in-

structions do not violate the rule against "singling out certain parts of the evidence." *St. Louis, I. M. & S. Ry. Co.* v. *Robert Hitt,* 76 Ark. 227.

7. This court as early as *Yarborough* v. *Arnold,* 20 Ark. 592, 598, announced the rule that in civil cases it is the duty of the jury "to decide in favor of the party in whose favor the weight of the evidence preponderates, and according to the reasonable probability of truth." It is only in criminal cases that the jury must be satisfied beyond a reasonable doubt. The rule has never been departed from in this State, and is the prevailing doctrine. See cases cited in 11 A. & E. Ency. of Law, (2 ed.) 491, and cases cited.

There is no exception to the rule in cases of gifts *"causa mortis,"* and therefore the court did not err in telling the jury in instruction nine that the burden was on the appellee to establish a valid gift of the certificate by a preponderance of the evidence. This rule as to the burden of proof does not in any manner contravene the doctrine that the evidence to establish a *donatio causa mortis* should be "clear and convincing, strong and satisfactory," as is properly held in many jurisdictions. *Lewis* v. *Merritt,* 21 N. E. (N. Y.) 141, and numerous cases cited in appellant's brief. The latter doctrine relates. not to the burden of proof or the preponderance of the evidence, but to its quality or probative force. Instruction number nine was an instruction on the burden of proof and declared the law on that subject applicable to the case at bar.

The instructions upon the whole were comprehensive and clear declarations, submitting accurately every phase of the evidence to the jury. If it were not so, the cause would have to be reversed, for the most difficult question with us has been to determine whether or not there was any evidence to sustain the verdict.

8. Giving the evidence its strongest probative force in favor of appellee, a majority of the court have reached the conclusion that there is sufficient evidence to support the verdict. Although, if sitting as jurors, we might have rendered a different verdict, yet we feel that, under well established rules of this court, we could not disturb it without invading the province of the jury. *St. Louis, I. M. & S. Ry. Co.* v. *Petty,*

63 Ark. 94; *Wallis* v. *St. Louis, I. M. & S. Ry. Co.,* 77 Ark. 556; *Rogers* v. *Choctaw, O. & G. Rd. Co.,* 76 Ark. 520; *Priest* v. *Hodges,* 90 Ark. 131; *Scott* v. *Moore,* 89 Ark. 321; *McClintock* v. *Frohlich,* 75 Ark. 111; *Davis* v. *Trimble,* 76 Ark. 115; *St. Louis S. W. Ry. Co.* v. *Byrne,* 73 Ark. 377; *St. Louis, I. M. & S. Ry. Co.* v. *Osborne,* 67 Ark. 399.

The evidence is set forth at length in the statement of facts. The kindly offices of the Harts to Mr. Carroll during the time he had formerly lived with them caused him to regard them as homefolks and their house as his home. When disease had prayed upon his frame until it became necessary for him to go to an asylum to be treated, and to seek the assistance of others, he said he wanted "to go home" to "John Hart's." His friend, believing that the hospital would be a better place for him to be treated, finally prevailed upon him to go there. But he was never satisfied there, and when the attending physician "intimated to him that he was not going to get well, he seemed to want to die at the home of his friend Hart." Before leaving the hospital, he was told that he might die, and was asked what he was going to do with his stuff (his money), and his reply was, "John Hart's folks will know what to do with my stuff." In a little while after he was carried to Hart's home, he took the certificate from his pocket, and in the presence of a witness handed it to Mrs. Hart, and said, "Here is a check for my money." On another occasion in the presence of witnesses he asked Mrs. Hart to get the certificate and let another look over it to see if it was O. K., and when this was done, and the certificate was handed to Carroll, he said he had given the certificate to Mrs. Hart, and handed it back to her. Now, if Carroll intended at the time he handed the certificate to Mrs. Hart to immediately pass to her the title and the right to draw his money on deposit, as the above evidence tends to show, and if she accepted it as her own, then the intention on his part to give, and on her part to accept, accompanied by delivery of the certificate for the purpose indicated, would constitute an absolute gift *inter vivos. Ammon* v. *Martin,* 59 Ark. 191. In such case the gift would still be *inter vivos,* although the donor was on his deathbed, and knew that he was going to die. For, although a man may be upon his deathbed, he may

still make a gift *inter vivos*. *Hatcher* v. *Buford,* 60 Ark. 109. There was some evidence to warrant the jury in finding such a gift. If, instead of giving Mrs. Hart the certificate, he had in fact given her a check for the money, the evidence of an absolute gift, under the circumstances, would have been conclusive. Well, the fact that Carroll spoke of the certificate as "a check" was some evidence that he intended to treat it as a check, and meant for it to have the same effect as a check in transferring the immediate title of the money on deposit from himself to appellee. He called the certificate "a check," and the jury might have concluded that he gave it this designation because he intended that appellee might use it as she would a check given her under the same circumstances. When approached in regard to making a will, Mr. Carroll said "he had thought at first he would make a will, but afterwards changed his mind; that he had already given the certificate to Mrs. Hart; that if he willed what he had away he would die a pauper." Then, after having the certificate examined and pronounced O. K. by Stout, he, Carroll, again handed the certificate to Mrs. Hart, saying to those present at the time, "I have given it to her, and she would know what to do with it in a few days." The above testimony, taken in connection with the other evidence tending to prove that Carroll then realized that he was soon going to die, warranted the jury in finding that there was a gift of the money "to appellee *causa mortis.*" In other words, the jury might have found from the above testimony that Carroll, being then on his deathbed and expecting soon to die, gave the certificate of deposit to appellee, which was a symbolic delivery of the money itself, and that appellee accepted the gift; that the intention of Carroll at the time was that no title or property in the money should pass to appellee except in the event of his death. These facts would constitute a gift *causa mortis.* The essential elements and characteristics of such gifts are fully set forth in *Hatcher* v. *Buford,* 60 Ark. 169.

It is unnecessary to repeat here what we said there. The doctrine of that case as to gifts *causa mortis* rules this upon the facts as the jury might have found them.

There is no reversible error in the record, and the julgment is therefore affirmed.

McCULLOCH, C. J. and BATTLE, J., dissent on the ground that there is no evidence of a gift, either *inter vivos* or *causa mortis*, legally sufficient to sustain the verdict.